# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00587-CV

---

**C. C., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 311577, THE HONORABLE CHRISTOPHER L. CORNISH, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant C.C. (Mother) appeals from the district court's conservatorship order. In two issues on appeal, Mother argues that the district court's order is void because the final hearing did not commence before the automatic dismissal date provided by Section 263.401 of the Family Code and that the district court abused its discretion in appointing the maternal grandparents as nonparent joint managing conservators. We will affirm the district court's order.

## BACKGROUND

On August 14, 2019, the Texas Department of Family and Protective Services filed an original petition seeking termination of Mother's and Father's parental rights to L.W. (Son), born March 9, 2019, and nonparent managing conservatorship of Son.[1] The suit was

---

[1] Father is not a party to this appeal.

based on allegations that Mother had exposed Son to methamphetamine use and domestic violence committed by Mother's boyfriend (Boyfriend). The case proceeded to a bench trial before an associate judge beginning June 23, 2021, continuing June 30, 2021, and concluding August 11, 2021. By the time of trial, the Department was no longer seeking termination of Mother's and Father's parental rights but was seeking to have the maternal grandparents appointed joint managing conservators of Son. At the conclusion of trial, the associate judge found that appointing Mother and Father as joint managing conservators would significantly impair Son's physical health or emotional development and that it was in Son's best interest to appoint the maternal grandparents as his joint managing conservators. On August 31, 2021, the associate judge issued its order appointing the maternal grandparents as Son's joint managing conservators and Mother and Father as possessory conservators. Mother requested a de novo hearing on the matter, which was held on October 12, 2021. At the conclusion of that hearing, the district court "confirm[ed] [the] ruling and order" of the associate judge and later issued its de novo order appointing the maternal grandparents as joint managing conservators of Son. Mother and Father were appointed Son's possessory conservators, and each had visitation rights to Son for no less than two hours twice per month, at the discretion and under the supervision of the maternal grandparents. This appeal by Mother followed.

## DISCUSSION

**Appellate Jurisdiction**

We first address a preliminary issue raised by the Department in its brief. The Department asserts that this Court lacks jurisdiction over Mother's appeal because she failed to timely file her notice of appeal. An appeal from an order in a child-protection case is accelerated

2

and must be filed within twenty days after the order is signed. *See* Tex. Fam. Code § 263.405(a); Tex. R. App. P. 26.1(b), 28.4(a). On November 9, 2021, Mother filed her notice of appeal from the "Order Appointing Managing Conservator signed by the Judge for this Court on November 8, 2021." However, no order was signed on that date, and the Department asserts that the notice of appeal was referring to the associate judge's order, signed August 31, 2021. Thus, in the Department's view, the notice of appeal was filed beyond the twenty-day deadline for appealing that order, which would have been September 20, 2021.

We disagree with the Department's contention that Mother's notice of appeal referred to the order of the associate judge. Mother had already "appealed" that order on August 13, 2021, by requesting a de novo hearing before the district court, which was held October 12, 2021. At the conclusion of that hearing, the district court confirmed the associate judge's ruling and, on December 14, 2021, signed its "De Novo Order Appointing Managing Conservator." Based on the sequence of events in the court below, including Mother's filing of her notice of appeal after the de novo hearing was held, we conclude that Mother's notice of appeal referred to the district court's order and that her notice of appeal from that order was timely. The filing of Mother's notice of appeal before the district court signed its order made her notice of appeal premature rather than late, and a premature notice of appeal does not deprive this Court of jurisdiction, provided that the appealable order is subsequently signed, as it was here. *See* Tex. R. App. P. 27.1(a) ("In a civil case, a prematurely filed notice of appeal is effective and deemed filed on the day of, but after, the event that begins the period for perfecting the appeal."); *Fusion Indus., LLC v. Edgardo Madrid & Assocs., LLC*, 624 S.W.3d 843, 849 (Tex. App.—El Paso 2021, no pet.) ("[I]n lieu of dismissal, we may treat a case that is appealed before the judgment is final as a prematurely filed appeal and permit the defect to be cured.").

3

Nor are we deprived of jurisdiction merely because Mother failed to include in her notice of appeal the correct date or full title of the order that she was appealing. It is clear from the totality of the record before us that Mother was appealing the district court's ruling, and to conclude otherwise would be to "elevate form over substance," which we will not do. *See Higgins v. Randall Cnty. Sheriff's Off.*, 257 S.W.3d 684, 688 (Tex. 2008) (stating that Rules of Appellate Procedure are to be interpreted "liberally in favor of preserving appellate rights"); *Verburgt v. Dorner*, 959 S.W.2d 615, 617 (Tex. 1997) (declining to "elevate form over substance" when determining whether appellant timely filed notice of appeal); *Walker v. Blue Water Garden Apartments*, 776 S.W.2d 578, 581 (Tex. 1989) (explaining that "the factor which determines whether jurisdiction has been conferred on the appellate court is not the form or substance of the [notice] but whether the [notice] 'was filed in a bona fide attempt to invoke appellate court jurisdiction'" (quoting *United Ass'n of Journeymen & Apprentices v. Borden*, 328 S.W.2d 739, 741 (1959))); *cf. City of San Antonio v. Rodriguez*, 828 S.W.2d 417, 418 (Tex. 1992) (holding that City's notation of incorrect cause number on its notice of appeal did not defeat the jurisdiction of the court of appeals as "there [was] no suggestion of confusion regarding the judgment from which the City sought appeal"); *Garcia v. Rodriguez*, No. 08-02-00379-CV, 2003 WL 21106619, at *2 (Tex. App.—El Paso May 15, 2003, no pet.) (mem. op. on motion) (concluding that typographical error on notice of appeal did not deprive appellate court of jurisdiction because order being appealed was "clear from the clerk's record" and declining to require appellant to amend notice of appeal because doing so "would serve no useful purpose").

We conclude that we have jurisdiction over this appeal.

**Automatic Dismissal Date**

In her first issue, Mother argues that the district court's order is void because the final hearing did not commence before the automatic dismissal date, thereby divesting the district court of jurisdiction over the case. We disagree.

In cases where the Department requests termination of parental rights or conservatorship of a child, the Family Code requires the court to begin trial within one year of appointing the Department as temporary managing conservator of the child. Tex. Fam. Code § 263.401(a). The trial court may extend the deadline once for 180 days upon finding that "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id*. § 263.401(b). If the trial court grants an extension under subsection (b) but fails to commence the trial on the merits before the dismissal date, "the court's jurisdiction over the suit is terminated and the suit is automatically dismissed without a court order." *Id*. § 263.401(c); *see In re G.X.H.*, 627 S.W.3d 288, 292 (Tex. 2021).

However, in response to the COVID-19 pandemic, the Supreme Court of Texas permitted trial courts to suspend the deadlines and procedures in Section 263.401. *See, e.g.*, *First Emergency Order Regarding the COVID-19 State of Disaster*, 596 S.W.3d 265 (Tex. 2020) (effective March 13, 2020) (providing that courts may "[m]odify or suspend any and all deadlines and procedures, whether prescribed by statute, rule, or order"); *Third Emergency Order Regarding the COVID-19 State of Disaster*, 596 S.W.3d 266, 267 (Tex. 2020) (effective March 19, 2020) (clarifying that authorization to modify or suspend deadlines and procedures "applies to all proceedings under Subtitle E, Title 5, of the Family Code, and specifically, to the

deadlines in Section 263.401"). Additionally, as the COVID-19 pandemic continued through 2020 and 2021, the Supreme Court authorized additional extensions of the automatic dismissal date, which had the effect of permitting the trial court to continue extending the dismissal date with each successive Supreme Court order.[2] *See E.N. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00014-CV, 2021 WL 2460625, at \*5 (Tex. App.—Austin June 17, 2021, no pet.) (mem. op.) (explaining that successive emergency COVID-19 orders "would theoretically have allowed the district court to extend the case indefinitely by granting an extension under each successive order" so long as "the Supreme Court would continue to authorize additional extensions").

Beginning with the Eighteenth Emergency Order, the trial court was required to comply with the requirements of Section 263.401(b) before it could extend the *initial* dismissal date. *See Eighteenth Emergency Order Regarding the COVID-19 State of Disaster*, 609 S.W.3d 122, 123 (Tex. 2020) (effective June 29, 2020) ("Subject only to constitutional

---

[2] *See, e.g., Twelfth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 144 (Tex. 2020) (effective April 27, 2020); *Seventeenth Emergency Order Regarding the COVID-19 State of Disaster*, 609 S.W.3d 119 (Tex. 2020) (effective May 26, 2020); *Eighteenth Emergency Order Regarding the COVID-19 State of Disaster*, 609 S.W.3d 122 (Tex. 2020) (effective June 29, 2020); *Twenty-Second Emergency Order Regarding the COVID-19 State of Disaster*, 609 S.W.3d 129 (Tex. 2020) (effective August 6, 2020); *Twenty-Sixth Emergency Order Regarding the COVID-19 State of Disaster*, 609 S.W.3d 135 (Tex. 2020) (effective September 18, 2020); *Twenty-Ninth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 863 (Tex. 2020) (effective November 11, 2020); *Thirty-Third Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 179 (Tex. 2021) (effective January 14, 2021); *Thirty-Sixth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 897 (Tex. 2021) (effective March 5, 2021); *Thirty-Eighth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 900 (Tex. 2021) (effective May 26, 2021); *Fortieth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 911 (Tex. 2021) (effective July 19, 2021); *Forty-Third Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 929 (Tex. 2021) (effective September 21, 2021); *Forty-Fifth Emergency Order Regarding the COVID-19 State of Disaster*, ___ S.W.3d ___, 2021 WL 6112278 (Tex. 2021) (effective November 23, 2021).

limitations, all courts in Texas may . . . in all proceedings under Subtitle E, Title 5 of the Family Code . . . extend the initial dismissal date as calculated under Section 263.401(a) only as provided by Section 263.401(b) . . . ."). In other words, the trial court was required to find that an extension of the initial dismissal date was justified by "extraordinary circumstances" and that continuation of the Department as temporary managing conservator was in the child's "best interest." *See In re A.W.*, 623 S.W.3d 519, 522 (Tex. App.—Waco 2021, no pet.); *In re J.R.*, 622 S.W.3d 602, 604–05 (Tex. App.—Fort Worth 2021, orig. proceeding); *see also In re J.S.*, No. 05-21-00898-CV, 2022 WL 620709, at *4 n.2 (Tex. App.—Dallas Mar. 3, 2022, no pet. h.) (mem. op.).

However, the Supreme Court's earlier emergency orders contained no such requirement. They simply permitted the trial court, "in all proceedings under Subtitle E, Title 5 of the Family Code, specifically including but not limited to Section 263.401(b)," to "modify or suspend a deadline or procedure—whether imposed by statute, rule, or order—for a stated period not to exceed 180 days." *See, e.g.*, *Seventeenth Emergency Order Regarding the COVID-19 State of Disaster*, 609 S.W.3d 119 (Tex. 2020) (effective May 26, 2020). Moreover, although the Eighteenth Emergency Order and subsequent orders required that the extension of the initial dismissal date comply with Section 263.401, the orders did not require compliance with Section 263.401 for additional extensions, providing instead that "for any case whose dismissal date was previously modified under [an earlier emergency order]," the trial court could simply "extend the dismissal for an additional period not to exceed 180 days from the date of" the order. *See, e.g.*, *Eighteenth Emergency Order Regarding the COVID-19 State of Disaster*, 609 S.W.3d at 123; *see also In re J.-R.A.M.*, No. 10-20-00221-CV, 2020 WL 7866877, at *3 (Tex. App.—Waco Dec. 30, 2020, pet. denied) (mem. op.) ("While the [later] emergency orders do expressly require

7

compliance with Section 263.401(a) regarding an initial extension, they do not expressly require compliance with an extension granted after the initial extension.").

In this case, the Department was named temporary managing conservator of Son on August 17, 2019. Thus, the initial dismissal date was August 17, 2020. On June 9, 2020, following the Supreme Court's Seventeenth Emergency Order, the district court entered its "First Amended Order Extending Deadlines,"[3] which extended the statutory deadlines and procedures in all cases filed by or involving the Department:

> The 146th Judicial District Court having received the Seventeenth Emergency Order Regarding the COVID-19 State of Disaster issued in Misc. Docket No. 20-9071 from the Supreme Court of Texas on May 26, 2020 following the Governor's declaration of the State of Disaster, this Court hereby finds that all cases filed in this Court under the Texas Family Code should have the statutory deadlines extended for a period not to exceed 180 days following the date of the Seventeenth Emergency order.

> IT IS THEREFORE ORDERED that all statutory deadlines and procedures for cases filed by or involving the Texas Department of Family and Protective Services are hereby extended until November 22, 2020. This order does not affect cases filed wherein the statutory deadlines are later than November 22, 2020 or the ability of the Court to extend cases beyond November 22, 2020 in accordance with the Texas Family Code.

This order authorized the extension of the initial dismissal date to November 22, 2020. The dismissal date was later extended three more times: on September 16, 2020, it was extended to

---

[3] A copy of the district court's order was not included in the appellate record but was attached as an exhibit to the Department's brief. We may take judicial notice of the district court's order. *See Freedom Commc'ns, Inc. v. Coronado*, 372 S.W.3d 621, 623–24 (Tex. 2012) (per curiam); *City of El Paso v. Fox*, 458 S.W.3d 66, 71–72 (Tex. App.—El Paso 2014, no pet.); *HealthTronics, Inc. v. Lisa Laser USA, Inc.*, 382 S.W.3d 567, 576 (Tex. App.—Austin 2012, no pet.); *Langdale v. Villamil*, 813 S.W.2d 187, 189–90 (Tex. App.—Houston [14th Dist.] 1991, no writ).

February 2, 2021; on December 16, 2020, it was extended to May 10, 2021; and on March 3, 2021, it was extended to July 13, 2021. Each time the dismissal date was extended, an emergency order related to COVID-19 permitted the extension, and each extension complied with the Supreme Court order in effect at the time.[4] Trial on the merits commenced June 23, 2021, prior to the final dismissal date. Accordingly, we conclude that the district court retained jurisdiction over the case at the time of trial, and its conservatorship order is not void. *See In re K.T.S.N.*, No. 01-21-00456-CV, 2022 WL 96737, at *5–8 (Tex. App.—Houston [1st Dist.] Jan. 11, 2022, pet. denied) (mem. op.); *J.-R.A.M.*, 2020 WL 7866877, at *3.

We overrule Mother's first issue.

**Conservatorship**

In her second issue, Mother argues that the district court abused its discretion in appointing the maternal grandparents as joint managing conservators. Specifically, Mother contends that the Department failed to overcome the presumption that the appointment of Mother as managing conservator was in the best interest of the child. *See* Tex. Fam. Code § 153.131(b).

---

[4] The Twenty-Second Emergency Order was in effect on September 16, 2020; the Twenty-Ninth Emergency Order was in effect on December 16, 2020; and the Thirty-Third Emergency Order was in effect on March 3, 2021. The language permitting the extension was identical in all three orders: "Subject only to constitutional limitations, all courts in Texas may . . . in all proceedings under Subtitle E, Title 5 of the Family Code . . . for any case whose dismissal date was previously modified under an Emergency Order of this Court related to COVID-19, extend the dismissal for an additional period not to exceed 180 days from the date of this Order." *See Thirty-Third Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d at 180; *Twenty-Ninth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d at 863–64; *Twenty-Second Emergency Order Regarding the COVID-19 State of Disaster*, 609 S.W.3d at 129–30.

*Standard of Review*

We review conservatorship determinations for abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). "As conservatorship determinations are 'intensely fact driven,' the trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record.'" *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002); *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)). "The trial court's judgment will be reversed only when it appears from the record as a whole that the court has abused its discretion." *Id*. (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). "A trial court abuses its discretion when it acts 'without reference to any guiding rules or principles; or in other words, [when it acts] arbitrarily or unreasonably.'" *Id*. (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)).

Under an abuse-of-discretion standard, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error but instead are factors used to determine whether the trial court abused its discretion. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). Under this standard, an appellate court considers whether the trial court had sufficient information on which to exercise its discretion and, if so, whether the trial court erred in its application of discretion. *Id*. at 588. "The traditional sufficiency review comes into play with regard to the first question; however, the inquiry does not end there." *Id*. (citing *Echols*, 85 S.W.3d at 478). "The appellate court then proceeds to determine whether, based on the evidence, the trial court made a reasonable decision, that is, that the court's decision was neither arbitrary nor unreasonable." *Id*.

10

*Evidence Presented*

This case involved allegations that Mother had exposed Son to her boyfriend's drug activity and domestic violence. In the Department's removal affidavit, a copy of which was admitted into evidence, Department investigator James Atkins averred that on August 2, 2019, the Department received a report alleging neglectful supervision of Son by Mother and Boyfriend, who was believed to be Son's father until DNA testing later excluded him. Atkins averred that Boyfriend was believed to be selling and using methamphetamine and that Mother, who was aware of Boyfriend's drug activities, was allowing Boyfriend to care for Son while Boyfriend was under the influence of drugs. Mother and Boyfriend were also believed to be in a "volatile relationship" in which Boyfriend had committed acts of domestic violence against Mother and, on one occasion, had treated Son "roughly" and "aggressively" at a restaurant while Boyfriend was under the influence of drugs. The Department had additional concerns regarding Mother's and Boyfriend's mental health and their living situation, as Mother and Boyfriend were "currently homeless" and "bouncing from home to home." Drug tests were performed on both Mother and Boyfriend at the beginning of the case, and although Boyfriend tested positive for methamphetamine, Mother tested negative "for all illegal substances."

The case proceeded to a bench trial on conservatorship. At trial, LaTrise Madison, the conservatorship worker assigned to the case, testified that Mother had been working services since the case began, was employed, had a home, was consistently attending counseling sessions, and had kept consistent contact with the Department. Madison also testified that she had not "received any concerns for any negative behaviors" by Mother during her visits with Son. However, the Department was concerned that Mother remained in a relationship with Boyfriend. Madison described an incident in January 2021, while the case was ongoing, in

11

which Boyfriend had allegedly assaulted Mother at her apartment, and the Department believed that Mother, despite claiming to have separated from Boyfriend, had told him where she lived and allowed him to visit her. Madison opined that "[r]ight now [Mother] can't take care of the child because we are concerned that she will continuously bring him around a man that is abusive to her and has a history of methamphetamine use." Madison testified that she did not believe Mother could provide a "safe home" for Son because of Boyfriend's presence there. She acknowledged that Mother has "pretty much done what it is that she needs to do with the exception of her decision-making" regarding Boyfriend. Madison also was concerned because for approximately two weeks while the case was ongoing, Mother had left the state and gone to Michigan.

Regarding Mother's housing situation, Madison testified that Mother lived in an apartment in Austin through Youth Service Housing, a program that provides partially subsidized housing "for indigent or homeless youth up to the age of 25." Mother was 24 at the time of trial and thus would age out of the program within a year. Based on Mother's financial situation, which included her making approximately $10.00 an hour working at Whataburger, Madison did not believe that Mother, after she aged out of the program, would be able to afford unsubsidized rent and utilities at the apartment, which Madison testified cost approximately $1100 to $1200 per month. Madison added that she did not consider the apartment to be a safe and suitable home for Son because it was not clean and the roof had recently collapsed. Additionally, when Madison had visited Mother at her apartment, she had found male clothing there.

Madison further testified that Son had been placed with his maternal grandparents and that he had been living with them since the case began. Madison had observed Son with his

maternal grandparents and testified that they were bonded to him, were providing for all his emotional and physical needs, and were a safe and stable placement for him. Debbie Belviy, Son's guardian ad litem, had visited Son at the home of his maternal grandparents "multiple times" and similarly testified that Son appeared bonded with the grandparents, that they were meeting all his needs, that their home was a safe and stable placement, and that she had no concerns with the grandparents raising Son. Belviy opined, "The grandparents are very protective. They've done very well with [Son]."

Belviy also testified that Mother "doesn't make really good choices" and that she did not believe Son should be at Mother's apartment, adding that she was "very thankful [Son] was not at the apartment when the [assault] happened in January." Belviy explained further,

> When the case started, one of the things that was in the removal affidavit was that [Boyfriend] had choked mom out where she had literally blacked out from being choked, and then she leaves the state in the middle of the CPS case, and then she comes back and she's homeless, and she's going place to place, and then we get the call in January and when—I just re-read the police report, and it says that the police officer stated that her injuries included, you know, her eye but also that it appeared that they were consistent—her injuries to be consistent with being choked out again.

> Who keeps going back to a man that keeps choking them out? You know, it's a very big concern for me, and I just don't want [Son] around that. I just don't think that's in his best interest.

Belviy also did not know if Mother understood the degree of harm that exposure to domestic violence could cause to a young child. She testified, "I think that until she recognizes and admits to the things that are going on—Denial is not what we all need to hear about as far as her making good choices for [Son]."

13

Mother testified that she was completing her services to the best of her ability, continuing her counseling, and working at two Whataburgers, one for forty hours per week and another for ten to twenty hours per week, so that she could afford to buy a car. Her current transportation was by bicycle and bus. Mother denied that she was still in a relationship or living with Boyfriend, that Boyfriend had assaulted her at her apartment in January, and that she had given Boyfriend her address. Mother testified that a stranger had assaulted her and that there had never been any domestic violence between her and Boyfriend. When asked about the male clothing that Madison had found at her apartment, Mother claimed that it belonged to her.

Mother explained that she had left the state and gone to Michigan for two weeks because she was in an "unsafe situation" with M.C., a person from whom she was subleasing an apartment. According to Mother, she had a "technical restraining order" against M.C., and she thought "the further away [she] went, he wouldn't be able to find [her], but somehow he got [her] address of where [she] was at up there and threatened to come up there and find [her]," so Mother returned to Texas. Mother believed that her apartment was safe now from Boyfriend and M.C. because she no longer had contact with either man. Mother also testified that she had cleaned her apartment, that apartment management had repaired her ceiling, that she was able to afford rent in her one-bedroom apartment, and that she was ready for Son to be returned to her.

Both maternal grandparents (Grandfather and Grandmother) testified at trial. Grandfather testified that he and Son had a "fantastic" relationship and that they were "excellent buddies." Grandfather also testified that Grandmother acted as a "surrogate mom" to Son. She was Son's "go-to whenever he falls, cries, [gets] hungry, wet, all of the above." When asked how he felt about the possibility of Son being returned to Mother's care, Grandfather testified that he did not "feel good about it at all" because of Mother's "instability of being able to keep a

14

place to live, her social life, [Boyfriend], [M.C.] . . . leaving the state right in the middle of the CPS case, just doing barely what she needed to do as far as State requirements are, not going above and beyond, and in [his] opinion just not—not [having an] aptitude to take care of the child."

Grandmother similarly testified that Mother's "behavior throughout this whole thing has shown that her judgment is off and that she can't be trusted with [Son] due to the gentlemen that she hangs out with at times." Grandmother added, "I don't think that she has the ability to keep unfriendly people away from my grandson." Grandmother also was concerned that if Mother had unsupervised access to Son, she might "take [him] and run" away to another state. Grandmother further testified that she had visited Mother's apartment and that she believed it was "not safe for a 2-year-old. . . . She has all kinds of things all over the place. Her apartment is in disarray[]. She has not cleaned her apartment. I have seen tools all over the place." Grandmother did not believe that Mother had the ability to "keep an eye on [Son] enough," and she feared that if Son was with Mother unsupervised "for more than a couple of hours . . . he would come home hurt."

At the October 2021 de novo hearing, the district court heard additional testimony from Belviy, Mother, and Madison. Belviy testified briefly that "[t]he grandparents are doing a great job with [Son]," that Son was "thriving in the home" and was "very bonded to them," and that she saw "no reason to make any changes at this time."

Madison provided more information regarding the circumstances surrounding Mother's temporary departure from Texas. She testified that Mother had told her that she left the state because she had been evicted from her previous apartment, but Madison later learned that the apartment belonged to another man who Mother was dating (a man who had "drug concerns"

15

and a criminal history that involved sexual assault of a minor), and he had kicked Mother out of the apartment after they broke up. Mother then left the state, could not find a place to live, returned to Texas, was temporarily homeless, and then moved into her current apartment with the assistance of the Austin charity for homeless youth.

Madison then described the January 2021 assault of Mother at her apartment, which involved Boyfriend as the alleged perpetrator. Madison testified that Mother had told her that "she was asleep" at the time of the assault and "woke up to injuries" but "did not remember what happened." However, Mother's story contradicted the 911 call reporting the assault, a copy of which was admitted into evidence. In the call, Mother could be heard crying hysterically and saying that she needed EMS, while a male voice could be heard in the background yelling at Mother. Shortly thereafter, Mother could be heard saying that she no longer needed EMS, hanging up the phone abruptly, and refusing to provide additional information when 911 called her back. Madison testified that because of this incident, the Department was concerned that Mother remained in a domestic-violence relationship with Boyfriend and that she had lied to the Department about it. Madison further testified that the last time she had visited Mother's apartment, in July 2021, the apartment was "not clean" and had "different tools and nuts and bolts in the home" that were "[d]efinitely a choking hazard" for a young child. Madison did not believe the apartment was a safe and suitable home for Son.

Mother, in her testimony, agreed that she had "some ups and downs" during the case. She maintained that the last time she had seen Boyfriend was when the case began. She also testified that she was currently working at Whataburger and believed she would be able to afford her apartment even after the charity stopped assisting her with rent and that she had recently purchased a vehicle to have more visitation with Son.

16

*Analysis*

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam. Code § 153.002. "It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child." *Id*. § 153.131(b). Therefore, "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child." *Id*. § 153.131(a); *see Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990) ("The presumption that the best interest of a child is served by awarding custody to a natural parent is deeply embedded in Texas law."). The "strong presumption in favor of parental custody . . . imposes a heavy burden on a nonparent," who "must affirmatively prove by a preponderance of the evidence that appointment of the parent as managing conservator would significantly impair the child, either physically or emotionally," by presenting "evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *Lewelling*, 796 S.W.2d at 167. Evidence that "the nonparent would be a better custodian of the child" than the parent does not overcome the parental presumption. *Id*.

"The evidence cannot merely raise a suspicion or speculation of possible harm." *In re B.B.M.*, 291 S.W.3d 463, 467 (Tex. App.—Dallas 2009, pet. denied). "Instead, the evidence must support the logical inference that some specific, identifiable behavior or conduct of the parent will probably harm the child." *Id*. "Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or

17

alcohol abuse, or immoral behavior by the parent." *In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.). "Other considerations may include parental irresponsibility, a history of mental disorders and suicidal thoughts, frequent moves, bad judgment, child abandonment, and an unstable, disorganized, and chaotic lifestyle that has put and will continue to put the child at risk." *Id*. "The material time to consider is the present, and evidence of past conduct may not, by itself, be sufficient to show present unfitness." *Id*.; *see also May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied) ("If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling."). "However, this principle is qualified by the permissible inference that an adult person's future conduct may well be measured by his recent deliberate past conduct as it may be related to the same or a similar situation." *May*, 829 S.W.2d at 377 (citing *De Llano v. Moran*, 333 S.W.2d 359, 361 (Tex. 1960)).

Mother asserts that she was denied custody of Son only because of her history as a victim of domestic violence, which by itself is an impermissible reason to deny a parent custody of her child. *See Lewelling*, 796 S.W.2d at 167 (explaining that "evidence that a parent is a victim of spousal [or partner] abuse, by itself, is no evidence that awarding custody to that parent would significantly impair the child" and that "[a] parent should not be denied custody of a child based on the fact that he or she has been battered"). However, there was evidence in this case, apart from Mother's history as a victim of domestic violence, from which the district court could reasonably infer that Mother had engaged in "specific, identifiable behavior or conduct" that would "probably harm" Son. This evidence included Mother's ongoing relationship with Boyfriend, who was not only an alleged abuser but also an alleged drug dealer and admitted

18

methamphetamine user. There was evidence that Mother maintained this relationship even after Son had been removed from Mother's care. Although Mother claimed to have ended the relationship shortly after the case began, the district court was entitled to disbelieve Mother's testimony, particularly in light of evidence that male clothing had been found in Mother's apartment and that Boyfriend had allegedly assaulted Mother at her apartment in January 2021, approximately seventeen months after the case began. The district court could have reasonably inferred from this evidence that if Mother regained custody of Son, Son would continue to be exposed to Boyfriend's abusive and criminal behavior and that this exposure would significantly impair Son's physical health or emotional development.

Additionally, there was evidence that while the case was ongoing, Mother had a relationship with another man, M.C., who, the Department alleged, had "drug concerns" and a criminal history that included a conviction for sexual assault of a minor. This relationship, which Mother described as an "unsafe situation," resulted in Mother having to obtain a restraining order against M.C. and to leave the state for approximately two weeks in an attempt to get away from him. The district court could have reasonably inferred from this evidence that Mother exercised poor judgment in her relationships and that her decisions presented an ongoing danger to Son's physical health or emotional development. Because Mother had already left the state once, the maternal grandparents were worried that Mother could leave the state again, this time with Son, if she regained custody of the child. Grandmother testified that Mother's "behavior throughout this whole thing has shown that her judgment is off and that she can't be trusted with [Son] due to the gentlemen that she hangs out with at times," and she did not think that Mother had "the ability to keep unfriendly people away from" Son. The district court could have credited Grandmother's testimony, along with the testimony of Belviy and Madison

summarized above, in finding that Mother's poor judgment and decision-making ability would significantly impair Son's physical health or emotional development moving forward.

The district court could have further found that Mother's housing situation, although currently stable, might not be stable much longer because Mother would soon age out of the charity for homeless youth that had provided her with rental assistance. Moreover, even if Mother would be able to continue living in the apartment, Madison and Grandmother had visited Mother there, and neither of them had found it to be a clean, safe, or suitable environment for a young child.

Finally, there was evidence that Son was bonded with his maternal grandparents, that they were providing for all his physical and emotional needs, and that their home was a safe and stable environment for him. Son, who was now approximately two years old, had lived with the maternal grandparents since he was four or five months old, and the district court could have reasonably inferred that removing Son from the custody of the relatives who had been raising him for most of his life would significantly impair his physical health or emotional development. *See Danet v. Bhan*, 436 S.W.3d 793, 797–98 (Tex. 2014) (explaining that evidence of past misconduct by parent that resulted in removal of child, combined with evidence tending to show that child had been placed in stable environment and had bonded with current placement, supported finding that returning child to parent would cause significant impairment to child).

In sum, we cannot conclude on this record that the district court abused its discretion, i.e., acted arbitrarily or unreasonably, in its conservatorship order. The district court had sufficient evidence, summarized above, on which to exercise its discretion and did not err in its application of that discretion in appointing the maternal grandparents as Son's joint managing conservators and in not appointing Mother as Son's managing conservator.

We overrule Mother's second issue.

## CONCLUSION

We affirm the district court's conservatorship order.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed:   April 15, 2022